THIS was an action of debt, brought by the bank against the drawer and endorsers, except Thomas Jam. éson, of the following bill of exchange.
‘ Mountsterling, 23rd June, 1819.
‘Ninety days after date, this my first of exchange, f second of same tenor and date unpaid, pay Enoch « Smith, oforder, at the Bank of the United States iu í Philadelphia, twenty-five hundred dollars, value re. f ceived, and place it to account of your obedient ser. 6 rant.
J. A. TURNER.9
This hill was addressed to EH Shortridgé, Esq. of Montgomery county in,this state, and after being accepted by him, was endorsed by Enoch Smith, to J. Jameson, by Jameson to John Mason Jr. by Mason to €reorge Howard and by Howard to the Bank.
On the trial, in the circuit court, the bill and endorsements were given in evidence, together with a *14 protest for non payment, made on the 24th of Septem* ^or 18by a notary public in Philadelphia. It was also proven, ihat the note was purchased by the Bank, and transmitted by it, with the endorsement of the Cashier thereon, to the Commercial Bank of Pennsylvania in Philadelphia. for collection; that at the request of the Commercial Bank, the notary public on the 24th of September, 1819, applied at the Bank of the United States, in Philadelphia, and presented the bill for payment, and payment being refused, he protested the bill for non-payment, and on the same day addressed notices to Matthew Scott, the Cashier of the Bank of Lexington and each of the endorsers, drawer and acceptor of the bill, informing thorn of the protest and that they would be looked to for payment; that the notices were inclosed in a letter directed to Scott, at Lexington Kentucky, and put in the post-office at Philadelphia on the day of the protest. It was also proven, that the bill and protest were inclosed in a letter, directed to Scott, and put into the post office at Philadelphia, on the 25th of September, 1819. These letters, containing the notices, bill and protest, bear the same postmark, of Philadelphia, 25th September, and were proven to have been received by the Bank of Lexington on the morning of the 18th of October, 1819. It was also proven, that immediately on receiving the It tiers, other notices were made out, addressed to the drawer and endorsers of the hill, all of whom resided in the county of Montgomery, and on the same morning, a messenger was dispatched by the bank, who on the morning of the nineteenth of Octdber 1819, delivered to each of the endorsers and drawer, the notices which were transmitted by the notary at Philadelphia, together with the notices made out by the Bank of Lexington, on the receipt of those notices, and demanded of them payment of the bill, but which was not complied with ; though Enoch Smith, at the same lime, acknowledged on the protest the receipt of reasonable notice thereof, in writing. The messenger, by whom the notices were delivered, proved that ■ at the time the bill was purchased by the Bank of Lexington, he was one of the clerks, and that it was his business, when not absent, to attend at the post-office in Lexington on the arrival of the mails, for letters to the bank, and when be was absent, it was the business *15 of the other officers to attend the arrival of the mails; that it was his custom to cal! regularly at the post-office. and he had no recollection of his failure when in Lex. íngton, and he had no recollection of being absent for any short time b fore the 18th of October, 1819 ; but he could not say he had called at the post-office for letters on the arrival of the preceding three or four mails before the 18th of October, when the notices were received, nor could he say tha1 he was not absent from Lexington immediately pieceding that time, but had no recollection of being absent. The witness further said, that it was his duty to ride in the county and counties around Fayette on the business of the bank when necessary, and if he was absent, (of which he could not say.) he would not say any other officer of the bank called on the arrival of the mail for bank letters. It was further proven, that before, and ever since the date of the bill, the mail from Philadelphia to Lexington, arrived at Lexington three times a week, when not obstructed by some casualty, and letters dated at Philadelphia usually, in the months of September and October, arrived at Lexington, in ten, twelve and fifteen days, though they were at times de-. tained longer by accidents. It was also in proof, that letters were occasionly sent to and from Winchester to Philadelphia by the route of the mail past Lexington, and at other times by a different route past Mount-sterling to the distributing post-office in Mason county ; that regularly on the route by Mountsrerling, the mail arrived in Winchester twice a week, and that letters were usually received from Philadelphia on that line in about fifteen days, and that on tire line by Lexington, letters were usually received in about fifteen days from their post date in Philadelphia. There was no evidence of the mail being obstructed by any casualty in tiie fall of 1819, but the fall was proven to be unusually dry in this country, and the witness had no knowledge of any flood of water that fell beyond the Alleghany Mountains. It was also proven that the endorser, Thomas Jameson, departed this life previous to the commencement of this action.
2. After the evidence was through, the court, on the motion of the defendants, instructed the jury, that the law of the case was for the defendants, Howard, Smith and Masón; if the jury should find from the evidence *16 that the defendants have always resided in the county of Montgomery and state of Kentucky, before, a*, and since the date of the bill, and that the mail from Phil. adelphia, came twice a week from Washington Kentucky, by Fleming and Bath counties, to the town of Mountsterling, during the years 1818, 1819, 1820, and that it usually arrived át that place on that route within ten, twelve and fifteen days from Philadelphia, find that two or more mails had been lost by sending the protest and notices to Lexington.
An Wand chan^ewhicb has been dis counted by the Farmers ics’ Bank is puton the footjng of'a S'clmnge to the mode of recovery action^1*"0Í
Under the act of 1798, the said bank maintai a^oiiít action against the ¿rawer and dorsei-s"6 en* (where one has died,) of t^han”^ discounted65 by them,
*16 Under these instructions, a verdict was accordingly found for those defendants; and the question made by the assignment of errors, involves the correctness of the instructions given to the jury.
3. Before we examine the instructions of the court, it is proper we should notice an objection taken in argument by the defendant’s counsel, to the propriety of the plaintiff’s action, it was contended that a joint action of debt against the drawer and part of the endorsers of a bill of exchange, can in no instance be maintained, and as the ¡ilaintilf’s action is not against all the endorsers, though Thomas Jameson, the endorser not sued, is proven to have died before the action was commenced, it was insisted, that it cannot be sus. tained ; and hence it was urged, that the judgment should not be reversed at the instance of the plaintiffs, though the instructions of the court were admitted to be incorrect.
4. As respects inland bills of exchange, the avgUmeat would no doubt be conclusive «against the action, ^or neither at common law nor by the custom of mecchants, can a joint action be maintained against the drawer, and part, or all of the endorsers, and (here is no statute giving such an action on inland bills. But the bill on which this suit is founded, cannot be admitted to be an inland bill. The bill is proven to have been discounted by the Bank of Lexington, and there a provision in the charter creating that bank, expressly declaring, “ that all bills or notes discounted * by it, shall be placed upon the same footing as foreign ‘ b'bs of exchange, so that the like remedy may be had ‘ for the recovery thereof, against the drawer or draw.. * ei's« endorser or endorsers, and with like effect, (ex- ‘ cept so far as relates to damages.;” It is true, the remedy on foreign bills was anciently the same as on *17 infand bills, but by an act of the legislature of this country, 2 Lit. 101, it is made lawful for any person or persons having a right to demand any sum of mo ney upon any protested foreign bill of exchange, to commence and prosecute an action of debt for princi pal, interest and charges of protest, against the draw. ers and endorsers jointly, or against either of them separately, Under this act, and that incorporating the bank, therefore, there is no question but a joint action may be maintained by the plaintiffs against the drawer and endorsers of any bill which maybe dis counted by the bank. It is true, according to the lit eral import of the act giving the action, the action should be either separate against each, or joint all; but the joint action against all, we apprehend, in case of the death of any, must survive against the survivors, and as Jameson, the endorser not sued, is proven to have died before the action was commenced, it was correct to join in the action, the drawer and .surviving endorsers only.
1 192-'
Anri the law the same d ise"l to the bank or to its cashier if it ^d by the1*1" bank;
5. In the preceding remarks, we have asserted the fact to be, that the bill was endorsed to the Bank of Lexington, and that assertion was made because is contained in the record such an endorsement, though in another part of the record, instead of an endorse ment to the bank, the endorsement purports to have been made to Matthew Scott, cashier of the bank.
As respects the result of the present contest, it is not, however, a'matter of any consequence, whether the bill in fact is endorsed directly to the bank or to the cashier of the bank. If the endorsement be directly to the bank, the preceding observations will shew the true character of the bill; and if the endorsement be to the cashier of the hank, as the bank is proven to have purchased and discounted the bill, the endorsement must of necessity inure to the benefit of the bank; so that if the endorsement be considered in either light, the bill should be treated as a foreign bill, and the plaintiffs entitled to sue the drawer and endorsers.
The objection taken in argument to the form of action, cannot therefore be sustained; so that the result of the cause in this court, must turn on the correctness of the instructions which were given to the jury by the circuit court.
The law requires no greater diligence in givinp notice of the dishonor of a bill from the pe'scn to whom it is transmitted for the pur¡ectiqn at°the place of payment than it ^m'the endorsee or purchaser.,
*18 6.If we are correct in treating the bill as a foreign biU# ¡here is unquestionably nd foundation for (he objection taken in argument to the regularity of the protest. The protest was made on the last day of grace, and whatever doubts may existas to the legality of such a protest in relation to inland bills, there can be none as respects foreign bills. ' No principle in relation to bills of exchange is better settled than that which re. cognizes the sufficiency of a protect for non payment of a foreign bill, on the last day of grace.
7. After the bill was-protested, it was. however, essential for the ba' k to exercise proper diligence in giving notice to earh of the defendants ; and it re. mains to enquire whether or not. admitting the facts on which (he instructions of the court were hypothecated, due diligence was used in giving notice?
If, instead of transmitting the bill to the Commercial Bank of Pennsylvania merely for the purpose of collection, the bill had been endorsed to that bank by the Bank of Lexington for a valuable consideration, there could no- he the slightest pretext for objecting to the sufficiency of the notice given by the plaintiffs J though notice might have been received by the defendants two or three mails sooner, if it had been sent directly from Philadelphia by the most expeditious route of the mail. For notice was given by the plaintiff with all reasonable despatch after receiving intelli. genre of the protest which was communirated to them by a letter put in the post office at Philadelphia on the day of the protest, and the Jaw is well settle , 'hat notice may not only be transmitted by mail, but that if, after the receipt of notice by one through whose hands the bill has passed, he exercises proper diligence in giving notice to those, whose names stand previous ta his on the hill, he will be entitled to recourse against them on the bill.
8. But the hill appears not to have been sold to tha Commercial Bank of Pennsylvania; it was transmitted to that bank merely for the purpose of collection, and the court below, in its instructions to the jury, seem to have gone on the supposition, that under such circumstances, notice should have been given to the defendants as soon as it might have been received by the post on the most direct and expeditious route from Philadelphia.
*19 \¥e, however, think differently. Where bills are re. mitted by the holder, to the place of payment, for the purpose of collection, no reason is perceived for requir ing greater diligence of the remitter of the bill, than would be required of him in case of an actual endorsement of the bill to the person to whom it is transmitted for collection ; and as in case of an endorsement the endorser would be entitled to his recourse against the preceding endorsers, on giving reasonable notice to tile rn of the dishonor of the bill after receiving no tice through the post of its dishonor, so, we appre. head, where a bill is remitted for the purpose of collection, it is sufficient for the remitter, after receiving notice by the post of the bill being dishonored, to exercise proper diligence in giving notice to such of the endorsers and drawer as lie may be disposed to look to for payment. The agent to whom a bill is remitted for collection, might, no doubt, give notice to the drawer and endorsers, of the bill being dishonored j but it is said to be regularly the duty of the agent to transmitió his principal,, notice of the non payment or non.-acceptance of the bill, together with the requu site protests, in order that the principal may give notice to the drawer or endorsers — 2 John. Cons. 1; and there is as much reason for allowing the agent to send notice by the post to his principal, as is for permitting notice to be sent by mail from the principal to the drawer or endorsers. In fact, in our researches on the subject, we have been unable to find any case inthe English courts, whereeven a doubt was raised as to the propriety of an agent, to whom a bill is sent for Collection, sending notice by the post to his principal ; and the adjudications of the courts of that country all seem to take it for granted, that the agent ought regularly to notify the remitter of the bill, of its dishonor, and that proper diligence in sending notice by the remitter of the bill, after he has received notice from his agent, is sufficient to charge the drawer and endorsers, though notice might have been dispatched by the agent from the place where the bill is dishonored, so as to have been sooner received by the drawer and endorsers, unless the agent has been in default in not sending notice to the principal in due time. See the American edition of Esp, Nis, part l, page 12and the authorities there cited.
*20 The judgment must, consequently, be reversed with costs, the cause remanded to the court below, and further proceedings there had, not inconsistent with the principles of this opinion.
In this case (General Hardin presented the following petition for a re hearing.
This cause has been decided by the court on the grounds, that the bill of exchange on which it is founded, although a domestic or inland bill, when drawn and endorsed by the defendants, was. upon its being purchased by the plaintiffs, translated by operation of law, from its native class, to that of a foreign bill of exchange, and the erdorser’s responsibility altered accordingly.
This idea was not broached in argument; is entirely new to the counsel for the appellees, and is believed to be new to the profession at large. It therefore should be fully examined whilst the first opinion rendered by this court is in its power, that the profession at least, should understand its bearing and influence.
The provision of the act of assembly incorporating the Independent Ranks, on which this decision is given. is copied from the original charter of the Bank off Kentucky, and the only difference observed between the two, is, that in the last law. the sections and ar. tides of sect ions are not marked as in the old law, hut are copied with apparent haste. The meaning of the two laws must be the same. It will, from the abov® circumstance, be easier to refer to the original law.
Before examining it minutely, let us bear in mind, that the term bill, not only in common parlance, but in, law, is a generic, terra, and alwajs requires some additional description, association or context to give it a specific meaning.
It is admitted that Bills qf Exchange form a prominent class of bills in law. But it is with confidence asserted, that bills obligatory, and under this head, bills single, and bills penal, form a well known class in law, and embraced originally promissory notes, technically so called,.after the operation of the statute ftf Ann,
*21 As evidence of this assertion, look at the heading of the two most extensive accounts of any bank, and you will find bills receivable, meaning all the notes they have discounted, and bills payable, meaning all the notes they have issued.
Now it is to be expected, that a legislature passing a law to incorporate a bank, would understand these terms, and if it intended to make any provisions relating to these, would provide according to the subject matter.
In 1806, when the Bank of Kentucky was chartered, Bills of Exchange were mercantile paprn*; their form, manner of transferíng, and the responsibility of the relative parties, were settled by linage, and statute, and of course no necessity then existed, of making any alteration in the law as to them ; a bare aotlenity to deal in bills of exchange would have been sufficient, leaving the liability of all concerned as the law then was.
But in relation to notes and bills obligatory, they were not mercantile paper. Every latent equity attached to them at any time, adhered to them and might annul their obligatory effect in the hands of the institution. Hence a necessity of declaring, by law, what paper of this character, as the law then stood, should become negotiable, and to declare what should be the relative responsibility of the parties.
The most obvious and simple description, was that v/hich, by the express contract of the parties, was made negotiable at said bank, and of course that paper which was framed with a view to facilities from, and responsibilities to the new institution. This paper might have been made mercantile from its execution, or the new institution might be favoured with the peculiar privilege of holding it as mercantile, while the rest of the world were to receive it as by law it stood, before the bank charter passed With these preliminary remarks, let us examine the law itself and see whether these were the views entertained by the legislature, who passed ihe law.
The 10 r.h article of the fundamental law for the corporation, in effect, authorises the dealing in discounts, the dealing in bills of exchange. &c.
And in the 19th sec. it is declared, that no note or obligation shall be negotiable at said bank, except it *22 be so expressed on the face of said note, excepting the notes of other banks, and of course all notes so expressed were the proper subjects of discount.
The 13th fundamental article purports to declare the effects: First, of bills obligatory and of credit under the seal of said corporation.
Secondly, it provides, that “ bills and notes which may be issued by order of the corporation, promising the payment of money, though not under seal, shall be binding, &c.” It then places these on the footing of foreign bills of exchange.
Pausing here, it is evident, that this article, thus far, uses the term bills to designate contracts whereby the drawer or bill maker, promises to pay money, and in the last provision of the law, the term bills is used as synonymous with notes, and cannot relate to bills of exchange, either from the context or particular expressions used.
This same article then provides, in the third place, that “all notes or bills at any time discounted by the said corporation, should be placed on the same footing as foreign bills of exchange.
This is the important clause in question.
The first remark presented, is, that the term bills, here, is surely used in the same sense in which it is used in the previous part of this article.
This article commenced with bills obligatory; it proceeds with bills and notes, necessarily meaning still, bills obligatory, and it then says notes or bills. Is it not obvious, that the rational course of expression is to use the same words in the same article or section of an instrument, in the same sense?
Rut again it is, “ all notes or bills.” shewing the term bills hereto be used as one mode of expressing writings promising to pay money ; which was also expressed by the term notes ; for this form of expression is proper where we wish to speak in the most enlarged sense of a class of things, or persons, designated by two terms, nearly but not.quite synonymous. In this country, we may with propriety speak ofall coun. scllors or attorneys, all preachers or divines, all suits or actions ; meaning to speak in the enlarged sense, but when we mean to include two distinct things or classes in this general frame of speech, the copulative and is always used. We say, all men and women, all *23 plaintiffs and defendants, all writs and declarations; and asubstitn'ion of or for and in these and other in stances of the like kind, will at once shew the impropri'.ty of this form of expression. *
But still further, the expressions are, all bills or notes at any time disco inted by the corporation.
Now in the regular course of bank business, the beneficial interest in bills obligatory and notes, is ne. ver acquired but by discount; that is, by procuring them for less than their nominal amount; that is, the counting off, from the amount called, a compensation for the time the note has to run. As the term discount covers all the regular bank acquisitions of notes or bills obligatory, if the legislature, as we contend, only intended to favour the bank in the regular business, no expression was so appropriate as the one used. It, with peculiar propriety, leaves the notes acquired by them by other and irregular contracts, to depend on such contracts.
But this expression, discounted by the corporation, is unapt as to bills of exchange, unless we can suppose the legislature intended the absurdity of dignifying the purchase of bills when the bank acquired them by a discount; that is, by a purchase for less than their amount; but designed to leave the transaction at large, and the existing law, if the purchase were for a premium ; that is, if more was given than thesum named in the bill.
We therefore rely upon this expression as conclusive also in favor of our construction of the law. If we are told the word discount is here used to designate the purchase or acquisition of the bill of exchange, without regard to price, we reply, it, is as contrary to the common and mercantile use of the term as any other that might have been used. It is as contrary to propriety to say that a bill of exchange has been discounted, when it is sold at a premium, as to say that a slave is discounted who is sold at his value. We talk of Banks and Brokers who discount notes and purchase bills of exchange, or deal in exchange; for exchange is ever fluctuating and unsteady. In the cause in question, there was evidence that the plaintiffs purchased the bill in question ; but none conducing to show that they discounted it.
*24 The after provisions of ihe statute in question, are also relied on. It gives remedy against drawers and endorsers.
These two embrace all the responsible parties to a bill obligatory, or note, and is appropriate for our construction of the law ; but if bills of exchange had been intended, it is asked, why is there no provision in the law respecting acceptors ?
To enforce these ideas, permit us to say, that an intention in thc'legifdature to enact a law which would place it in the power of third persons to alter and enlarge a contract made, is not to he presumed. But this is ihe effect of the construction adopted by the court. A mej chant in Natch; z, who never heard 0/ our batch of hank-’, draws a bill of exchange upon a correspondent at Pittsburg; the holder passes it to one of those banks, and thus the drawer is made, by the law of a slate henever visit; d, where he rimer dealt, where he never trusted his property, responsible beyond Ids contract; Ilia! is, on different events than those which hound him where he drew the bilL, and that too without his knowledge or consent.
There are too many reasons fo doubt ftie power of the legislature thus to act ex-territm ial'y - and there are too many considerations of policy i v; Jvco in it. if they had the power, to permit a belief that the legislature. if they d«i ig>.ed to broach this doctrine, would have acted on it by the insertion of a single word of doubitu! impon in a sentence referring principally and eerLi.ih to another subject.
Had the legislature so intended, that same caro which is manifest in s! e draught of this law, would have pointed out (tie necessity of using clear and unequivocal language.
Our construction involves no difficulty ; we say that by the law the bank may deal in bills of exchange, that is, buy and sell at what price they please; but that they deal on the same responsibilities and privileges, both as regañís themselves and others whose names are on the paper, as other dealers, by the general laws of the laud.
That they may discount notes, or bills obligatory, which are on the face made negotiable at the bank; and when such note or bill is discounted, the parties are responsible as on foreign bills of exchange; but *25 that if they acquired a note by other means than discount, they hold it as others hold o.her notes.
The court are therefore respectfully requested to grant a reheating of the cause.
Hardin, for Appellees.
The court however adhered to their opinion.